UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

SCOTT KIMBALL, On Behalf of Himself and :   ECF CASE
All Others Similarly Situated,    :
   :   Civil Action No.  05-CV-4725
               Plaintiff,    :
   :   CLASS ACTION COMPLAINT FOR
    vs.    :   VIOLATION OF THE FEDERAL
   :   SECURITIES LAWS
MBNA CORP., BRUCE L. HAMMONDS,    :
KENNETH A. VECCHIONE, RICHARD K.    :
STRUTHERS, CHARLES C. KRULAK,    :
JOHN R. COCHRAN, III, MICHAEL G.    :
RHODES, LANCE L. WEAVER and JOHN    :
W. SCHEFLEN,    :
   :
               Defendants.    :
   :
_____ x   <u>JURY TRIAL DEMANDED</u>

## INTRODUCTION

1.      This is a securities class action on behalf of all purchasers of the publicly traded securities of MBNA Corp. ("MBNA" or the "Company") between January 20, 2005 and April 21, 2005 (the "Class Period"), against MBNA and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      As MBNA's competitors lowered their guidance for 2005 in light of decreasing credit card revenues and increasing advertising expenses, on January 21, 2005, the start of the Class Period, MBNA issued the first earnings forecast in the Company's history, projecting an ongoing 12% earnings increase – with a 10% increase in 2005 earnings over its 2004 earnings.  It was explained that MBNA would make this target because the Company had reduced its reliance on no-interest "teaser" promotional lending so that MBNA's loan portfolio was more profitable than its competitors.  Defendants also projected a 20%+ increase in Return on Equity.  Defendants' EPS estimate for 2005 was $2.36 per share, which was 10% above the Company's 2004 EPS.  These projections were being made nearly one-third of the way into Q1 2005 and would be repeated throughout the Class Period.  Defendants also announced an increase in the Company's dividend to 17% and a $2 billion stock buyback program, promising "consistent, profitable growth" for MBNA despite the competition in the industry.

3.      Suddenly, on April 21, 2005, defendants shocked the market by disclosing MBNA had earned only $0.02 in Q1 2005 – a 93% decline from the $0.59 per share the Company reported in Q4 2004 – and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate.

4.      As a result of the defendants' false statements, MBNA's stock traded at inflated levels during the Class Period, which permitted the Company's top officers and directors to sell more than $75 million worth of their own shares.  During the Class Period defendants also caused

1

the Company to repurchase $250 million worth of its own stock, which supported the stock's high price.  Defendants also used the Company's purported stellar performance to justify the payment of millions of dollars in bonuses to them in January 2005.

5.      Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 at the close on April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume.  MBNA's market capitalization lost over $5.8 billion in one trading session and its credibility with the investment community has been shattered.

6.      The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a)      The Company had been experiencing "unexpectedly high payment volumes from U.S. credit card customers" during Q1 2005, reducing managed loans in the quarter "more than in prior years," and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1 2005 from $33.8 billion reported at the end of Q1 2004;

(b)      Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(c)      MBNA was suffering from an unseasonably sharp contraction in loans during Q1 2005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1 2004;

(d)      The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

2

(e)    MBNA was experiencing higher-than-expected delinquencies during Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f)    The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

(g)    Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in Q4 2004;

(h)    Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i)    Due to the increase in pre-pays, the interest-only securitization strip securities valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

(j)    The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

## JURISDICTION AND VENUE

7.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

8.    (a)    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many, if not most, of the Company's significant business relationships are maintained in this District, including a relationship with American Express, which, as further detailed in paragraph 33 herein, the Company has represented will account for up to 10% of the Company's projected annual income growth.

Also, the Company has transacted significant banking business in this District, including a $750 million  tranche in April, 2005 of a Master Note Trust of fixed rate asset-backed notes, which transaction was jointly-led by the Company and banks located in this District, including Credit Suisse First Boston, JP Morgan, Citigroup, Merrill Lynch, and Morgan Stanley, as further detailed in paragraph 47 herein.

(b)    According to the Company's web site, the Company maintains a regional office in this District.

## THE PARTIES

9.    Plaintiff Scott Kimball purchased MBNA publicly traded securities as described in the attached certification and was damaged thereby.

10.    Defendant MBNA is a bank holding company and the parent of MBNA America Bank, N.A., ("MBNA America") a national bank.  MBNA America has two principal subsidiaries: MBNA Europe Bank Limited and MBNA Canada Bank, fully chartered banks that issue credit cards in the United Kingdom, Ireland, Spain, and Canada.  The Company is headquartered at 1100 North King Street, Wilmington, Delaware and has over 1.277 billion shares of common stock issued and outstanding which trade on the NYSE under the ticker symbol "KRB."

11.    Defendant Bruce L. Hammonds ("Hammonds") is Chief Executive Officer ("CEO"), President and a director of MBNA.  Prior to assuming these positions on December 30, 2003, Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA America Bank, MBNA's principal subsidiary.  Hammonds has been a director of MBNA since 1986. Hammonds has 35 years of management experience in consumer lending and was a member of the management team that established MBNA in 1982.  During the Class Period, Hammonds sold more than $9 million worth of his MBNA stock.

4

12.    Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank.  Vecchione has been a director of MBNA America since January 2005 and also serves as CFO of MBNA Delaware. Vecchione is responsible for accounting, corporate and strategic planning, treasury and financial operations, business analysis (including M&A analysis), financial planning, and investor relations. Vecchione spoke at the February 9, 2005 CSFB investor conference.  During the Class Period, Vecchione sold more than $2.6 million worth of his MBNA stock.

13.    Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America.  Struthers is also a director and serves as Chief Loan Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada.  In addition, Struthers is a director and serves as Chairman and Chief Executive Officer of MBNA Delaware.  Struthers is responsible for international operations, consumer finance, business lending, and MBNA America's American Express credit card program.  Struthers has 27 years of experience in consumer lending and was a member of the management team that established MBNA America in 1982.  During the Class Period, Struthers sold more than $12 million worth of his MBNA stock.

14.    Defendant Charles C. Krulak ("Krulak") was Vice Chairman of MBNA and MBNA America.   Krulak is responsible for corporate development and acquisitions, personnel, compensation and benefits, and education and career development.  Krulak previously served as CEO of MBNA Europe.  During the Class Period, Krulak sold more than $13 million worth of his MBNA stock.

15.    Defendant John R. Cochran, III ("Cochran") was the Chief Operating Officer of MBNA and is the Chairman, Chief Executive Officer and President of MBNA America.  Cochran previously served as the Chief Operating Officer and Chief Marketing Officer of MBNA America.

Cochran has 32 years of management experience in the financial services industry and was a member of the management team that established MBNA America in 1982. Cochran has been a director of MBNA America since 1986. During the Class Period, Cochran sold more than $14 million worth of his MBNA stock.

16.     Defendant Michael G. Rhodes ("Rhodes") was Group Executive for the U.S. Credit Card Business Development division of MBNA. Rhodes spoke at the February 9, 2005 CSFB investor conference. During the Class Period, Rhodes sold more than $10.8 million worth of his MBNA stock.

17.     Defendant Lance L. Weaver ("Weaver") was Vice Chairman of MBNA and MBNA America. Weaver is also a director of MBNA America. Weaver is responsible for MBNA America's U.S. credit card business, including business development, marketing, sales, customer satisfaction, U.S. regional operations, credit, customer assistance and fraud. Weaver also serves as a board member and former chairman of MasterCard International Inc. Weaver has 30 years of experience in consumer lending and administration and has been with the Company for 14 years. Weaver has been a director of MBNA America since 1993. During the Class Period, Weaver sold more than $10 million worth of his MBNA stock.

18.     Defendant John W. Scheflen ("Scheflen") was Vice Chairman of MBNA America. Scheflen also serves as Secretary of MBNA and MBNA America. Scheflen is responsible for corporate governance, compliance, information security, operational risk management, and portfolio risk management. During the Class Period, Scheflen sold more than $3.3 million worth of his MBNA stock.

19.     The individuals named as defendants in ¶¶11-18 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company,

6

possessed the power and authority to control the contents of MBNA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein at ¶¶33 and 47, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

### SCIENTER

20.    In addition to the above-described involvement, each Individual Defendant had knowledge of MBNA's problems and was motivated to conceal such problems.  Vecchione, as CFO, was responsible for financial reporting and communications with the market.  Many of the internal reports showing MBNA's forecasted and actual growth were prepared by the finance department under Vecchione's direction.  Defendant Hammonds, as CEO, President, and director of MBNA, and the other officer defendants named herein were responsible for the financial results and press releases issued by the Company.  Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

21.    Defendants were motivated to engage in the fraudulent practices alleged herein in order to sell over $75 million worth of their personally held MBNA stock to make up for their decreased salaries and bonuses and to justify the receipt of their exorbitant bonuses and performance-based restricted stock grants in January 2005.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

22.     Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose adverse facts known to him about MBNA.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MBNA publicly traded securities was a success, as it (i) deceived the investing public regarding MBNA's prospects and business; (ii) artificially inflated the price of MBNA's publicly traded securities; (iii) allowed defendants to obtain larger bonuses and performance-based restricted stock grants which were directly tied to the Company's falsified performance; (iv) allowed defendants to arrange to sell and actually sell in excess of $75 million worth of MBNA shares at artificially inflated prices; and (v) caused plaintiff and other members of the Class to purchase MBNA publicly traded securities at inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

23.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated MBNA's stock price and operated as a fraud or deceit on Class Period purchasers of MBNA stock by misrepresenting the Company's business success and future business prospects.  Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's business prospects.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, MBNA stock fell precipitously as the prior artificial inflation came out of MBNA's stock price.  As a result of their purchases of MBNA stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

24.     During the Class Period, the defendants presented a misleading picture of MBNA's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that MBNA's business was not as healthy as represented, defendants caused MBNA to falsely represent the

8

strength of its growth in new loans, delinquency rates, loan loss rates, its ability to wean its sales model off teaser no-interest promotions, the value of its interest-only securitization strips and its forecasted earnings.

25.     These false claims of strong future results and the successful cessation of the Company's reliance on no-interest teaser promotional offers caused and maintained the artificial inflation in MBNA's stock price throughout the Class Period until the truth was revealed to the market.

26.     Defendants' false and misleading statements had the intended effect and caused MBNA stock to trade at artificially inflated levels throughout the Class Period, permitting insiders to sell almost $76 million worth of in their own MBNA stock and to justify the payment of millions of dollars in bonuses and other incentive compensation to themselves.

27.     On April 21, 2005, defendants were forced to publicly disclose that: (i) the Company was experiencing "unexpectedly high" prepayment volume during the Q1 2005; (ii) that during Q1 2005 more of the prepayments were the higher interest, higher revenue portion of its loan portfolio; (iii) that MBNA was suffering from an unseasonably sharp contraction in loans in Q1 2005; (iv) that MBNA was experiencing higher-than-expected delinquency rates during the Q1 2005; (v) that loan losses were increasing; (vi) that the Company had reversed it policy of not offering teaser no-interest promotional cards; (vii) that the value its interest-only securitization strips was overstated by 16%; and (viii) that the Company's previously announced Q1 2005 restructuring charge had doubled during the quarter to $767.6 million.  As investors and the market became aware that MBNA's actual business prospects were poorer than represented, which had been obfuscated by defendants, the prior artificial inflation came out of MBNA's stock price, damaging investors.

28.     As a direct result of defendants' admissions and the public revelations regarding the truth about MBNA's previous representations and its actual business prospects going forward, MBNA's stock price plummeted almost 20%, on unusually high volume, falling from $23.11 per share on April 20, 2005 to $18.50 per share on April 21, 2005, a one-day drop of $4.61 per share, on 793% of the average daily trading volume.  This drop removed the inflation from MBNA's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and MBNA's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of up to $4.61 per share.

29.     The almost 20% decline in MBNA's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of MBNA's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  During the same period in which MBNA's stock price fell almost 20% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat.  The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate MBNA's stock price and the subsequent significant decline in the value of MBNA's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## BACKGROUND

30.     As a result of the lack of independence on the MBNA Board of Directors, MBNA's executives had become accustomed to receiving very heady compensation.  In fact, the Company now admits it had previously followed what it describes as "a ***policy*** of providing high levels of

compensation." Following a shareholder-led shakeup of the MBNA Board in 2004, the MBNA Compensation Committee finally made significant reductions in executive compensation resulting in a 34% reduction in total direct compensation for MBNA's CEO, defendant Hammonds, and a combined 37% reduction in total direct compensation for defendants Hammonds, Cochran, Struthers, Weaver and Vecchione, the Company's five most highly compensated executive officers.

31.     As a result of these cuts, at the beginning of the Class Period the Company's senior executives faced massive reductions in the level of compensation to which they had grown accustomed to receiving. At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options, which would have expired if not exercised by the expiration date. The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. Some of these stock options would have expired in 2005 if not exercised. Defendants knew the value of these options and shares would rapidly decline if they disclosed the true status of the Company's operations and business environment.

32.     Moreover, despite the attempt to better align MBNA's executive compensation with shareholder interests, the Company's executive compensation program for 2004 still utilized "short term corporate performance" as a primary metric in determining annual compensation to senior executives. As a result of defendants' concealment of the Company's true operating and financial status for 2004, defendants determined that the Company had "substantially achieved its net income goal and achieved its performance objectives for new accounts, managed credit losses and operating efficiency," but that it "did not achieve its goal for growth in managed loans or net interest margin." Nonetheless, the Compensation Committee determined that the Company's "overall results for 2004

were strong and the [Company] had a number of significant achievements in 2004 that the Committee and management believe position the [Company] well for the future." As a result, in January 2005 the Compensation Committee awarded a performance bonus to Hammonds equal to 90% of his 2004 salary, and awarded bonuses to Cochran, Weaver, Struthers and Vecchione equal to 80% of their 2004 salaries. Moreover, according the Company's Schedule 14A, filed with the SEC on March 15, 2005, the Company paid the aforementioned individuals, the Company's five highest-paid executives, millions of dollars worth of restricted stock awards (which vest 20% per year over a five year period and require no payment to exercise and, for year 2004, and moving forward, are directly tied to MBNA's financial performance). For example, for year 2004, these performance-based restricted stock awards were allocated in value as follows: Hammonds received $5,458,000.00; Cochran received $4,880,500.00; Weaver received $3,386,500.00; Struthers received $3,387,500.00; and, Vecchione received $2,710,500.00.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

33.    On January 20, 2005, defendants issued a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.56 Per Common Share - Announces New $2 billion Common Stock Repurchase Program." Promising to increase earnings by decreasing the churn associated with no-interest credit card offerings, in the press release and the earnings conference which followed it the next morning, defendants announced that MBNA had then reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. Defendants also reported a 9% rise in Q4 2004 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the Q4 2004 delinquency rate declined to 4.13% of loans outstanding from 4.39% in Q4 2003, that loans grew 3% to $121.6 billion, that the Company was raising its dividend

by over 17% and that its Board had approved a buyback of up to $2 billion in stock (or 6% of the

outstanding shares), indicating defendants felt MBNA's stock was under-priced:

> MBNA Corporation announced today that net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth quarter of 2003. For the full year, net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to $2.34 billion or $1.79 per common share for 2003.

> "We grew earnings 15% in a slower industry growth environment and were able to launch several new and exciting programs such as our partnership with American Express and the acquisition of new businesses," said Bruce L. Hammonds, Chief Executive Officer of MBNA Corporation. "We are pleased with the results achieved in 2004."

> ***In addition, MBNA's Board of Directors has approved an increase of 17% in the quarterly dividend rate to $.14 per common share, which will increase the annual rate to $.56 per common share. MBNA has increased the dividend every year since it became a public company.*** The cash dividend is payable April 1, 2005 to stockholders of record as of March 15, 2005.

> MBNA's Board of Directors has also approved a share repurchase program and authorized the repurchase of up to $2 billion of common stock over the next 2 years. Stock repurchases will be done selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which utilizes share repurchases to offset the impact of stock-based compensation programs.

> MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.

> ***The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006.*** Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to

consolidate some of its facilities. The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation.

"The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives." Some highlights for the year include:

- Hundreds of thousands of Customers activated their American Express-branded cards in the fourth quarter taking advantage of the valuable benefits of an American Express branded card backed by MBNA's top-notch Customer satisfaction.

- Throughout 2004, MBNA reduced its reliance on 0% promotional offers as a driver of receivables growth and introduced a number of value-based products centered upon the WorldPoints rewards platform. MBNA is driving innovative products through its powerful affinity partner distribution network and providing Customers with a wide array of choices, based on their individual needs and interests. Whether Customers choose an NFL Extra Points Visa, a PGA Tour Platinum MasterCard, or one of many professional or alumni programs, MBNA has a credit card to fit each Customer's individual needs and preferences.

- Internationally, MBNA's businesses in the United Kingdom, Canada, and Spain continue to provide additional loan growth opportunities through the same affinity marketing strategy that drove the company's success over the last 20+ years. MBNA has more than 5,000 affinity partners in its U.S. and international businesses.

- MBNA continued to diversify in 2004 with the purchases of Premium Credit Limited (PCL), MBNA's premium financing company in the UK, and Sky Financial, MBNA's professional practice financing business in the U.S.

Loan receivables at December 31, 2004 were $33.8 billion, an increase of $134.8 million over year-end 2003. Total managed loans at December 31, 2004 were $121.6 billion, an increase of $3.1 billion over year-end 2003.

Losses on loan receivables and managed loans for the fourth quarter of 2004 were 3.74% and 4.43%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.29% and 4.13%, respectively, at December 31, 2004.

34.     On January 21, 2005, Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history.  Defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions.  Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package.  According to defendants, the program would result in a Q1 2005 charge of $300 million to $350 million *but was expected to save $150 million in 2004 and even more in 2006*.

35.     Set to convince the market that unlike other credit card companies, MBNA would increase earnings by increasing its margins by lowering reliance on the less profitable no-interest card offerings, defendants gave what were essentially *pro forma* earnings results backing out their existing no-percent loans:

> Now, *we have been running off our zero rate loans*, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans.  *If you add that back in, our growth rate would have been 5 percent.*  The last numbers I saw for the industry through November was 2.5 percent, *so we grew at about twice the industry, which is what we normally do*.

> *              *              *

> The fact that *we're running off zero loans* means that we don't have to re price as many of our existing customers on the back end ....

36.     Defendants also explained that that the Company's delinquency and loss rates would decrease:

> Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year.  And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and *as we look out*, it would seem to us that *delinquency and losses should continue to decrease*.

37.     Concerning growth the Company purported to *then* be experiencing, defendants said:

> We expect earnings growth to average about 12 percent over the next several years.  There will be years when it's more than 12, and years when it's less than 12.

And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

*       *       *

**Our 2005 EPS is $2.36, a 10% increase over 2004.** We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.

Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.

**And we feel confident that we will continue to deliver consistent, profitable growth well into the future.** Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

38.     Specifically describing how the Company would increase earnings by decreasing its

reliance on no-interest loans, defendants stated:

Growing profitable loans; let me just discuss with you our zero strategy. It's a place that we are happily diverging from our peers. We obviously were into zero in a big way a few years ago. About 12 to 18 months ago, we saw things happening in this area that we didn't like.

16

We saw surfing activity increasing, so we saw more and more customers open the account just for zero, and pay it off before the rate changed. The duration on zero moved out. When we started doing zero, we were doing it for a four-month duration. Today, you need to be added 15 months or maybe even life. And we still saw the marketing disappear.

As I said earlier, zero is bad, I think, for the entire industry, but I know it's bad for MBNA. It forces you to re price many of your other customers to pay for it. That's not the way to run a business, to take your long-term customers and re price those to bring in new customers at zero. And just a personal opinion, I think it can make your marketing and advertising areas very lazy. If you can give things away, you sure don't have to be creative.

*So we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability, and it's better for the customer.* Now, this chart shows you why we do that. The line of the top is what happens when you put on a zero rate loan.



You can see the balance billed is much faster, early activation and high balance transfers, but over the long-term, full rate loans balances actually exceed zero, just about at the 9-month mark when we get ready to re price our zero-rate loan. So, it makes no sense for us to continue to do those zero-rate loans, with very few exceptions. The rewards programs give us opportunity to reinforce the affinity relationship. Zero certainly does not leverage affinity marketing.

Now again, like I said earlier, we decreased $4 billion in zero-rate loans in the U.S. This is what will happen next year. It will continue to come down, as I said earlier, through the second quarter and the early part of the third quarter and then it

17

will normalize.  We don't love the impact that that has on our top line, but it is absolutely the right thing to do.



39.     Following the earnings announcement, the *New York Times* reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial."

40.     MBNA's reported Q4 2004 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for the Q4 2004 but guiding expectations down, saying that its own 2005 earnings could be at the low end of Wall Street expectations.  Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves.  Shares in Citigroup dropped $0.27 to close at $47.77.

41.     MBNA's report also came a day after competitor Capital One Financial Corp. announced that its Q4 earnings had fallen 27% to $ 195 million.  Capital One's per-share earnings, $0.77, were $0.22 short of Wall Street expectations.  Capital One attributed its own shortfall to $511

18

million of expenses for marketing and advertising in the quarter. Capital One CEO and Chairman Richard Fairbank told investors that he expected such spending to continue throughout 2005, and that similar outlays by the credit cards units of Citigroup Inc. and J.P. Morgan Chase & Co. made it necessary: "I think you are seeing, at least for the three of us, a sort of structural move toward the national-brand game. I don't really see anybody backing down." On this news, Capital One's stock fell by almost 8%, from approximately $83 per share prior to the announcement to below $77 per share in the days following the announcement.

42.     On January 25, 2005, analyst Matthew Park at A.G. Edwards increased his investment rating on MBNA's stock to "buy" from "hold," saying he came away from MBNA's January 21, 2005 earnings conference encouraged about MBNA's future profitability.

43.     Based upon defendants' promises that MBNA's delinquency and losses rates were improving and its extraordinary Q4 2004 results, and buffeted by the increase in MBNA's dividend, the increase in its stock buyback program, anticipated savings from the employee reduction program, and, most of all, the end of its own reliance on zero-interest credit card offerings and the positive net effect that it would have on earnings and Return on Managed Assets ("ROMA"), MBNA's stock price closed up $0.24 to $27.44 on the NYSE on January 21, 2005. Certain of the Individual Defendants began rapidly selling almost $76 million worth of the Company's stock into the market:

| Date | Defendant | Shares Sold | Price | Gross Proceeds |
|------|-----------|-------------|-------|----------------|
| 01/25/2005 | Rhodes | 406,040 | $26.76 | $10,865,630 |
| | Weaver | 376,835 | $26.76 | $10,084,105 |
| | Krulak | 130,000 | $26.61 | $3,459,300 |
| | Scheflen | 125,810 | $26.85 | $3,377,999 |
| | Vecchione | 79,829 | $26.70 | $2,131,434 |
| | | 20,633 | $26.80 | $552,964 |
| 01/27/2005 | Cochran | 398,150 | $26.51 | $10,554,957 |
| | | 133,009 | $26.55 | $3,531,389 |
| 01/27/2005 | Hammonds | 351,409 | $26.51 | $9,315,853 |
| 01/31/2005 | Krulak | 92,483 | $26.50 | $2,450,800 |
| 02/01/2005 | Krulak | 224,754 | $26.75 | $6,012,170 |

| Date | Defendant | Shares Sold | Price | Gross Proceeds |
|---|---|---|---|---|
| | | 50,217 | $27.00 | $1,355,859 |
| 02/03/2005 | Struthers | 457,464 | $26.84 | $12,278,334 |
| | | 2,846,633 | | $75,970,792 |

44.    On February 9, 2005, defendants appeared at a Credit Suisse First Boston ("CSFB") investor conference to discuss the Company's Q4 2004 results and future expectations.  As they had during the January 21, 2005 earnings conference, defendants displayed the following chart depicting the Company's history of "Consistent, Profitable Growth" at the CSFB conference:



45.    Based on defendants' statements concerning the financial results and business environment they said MBNA was then experiencing, defendants once again stated MBNA would achieve 12% average annual EPS growth – with 10% in 2005 – and a 20%+ increase on Return of Equity.

46.    During the February 9, 2005 CSFB presentation, defendants once again attempted to increase investor confidence by repeating statements made concerning the "Rating Agency Perspective" during the January 21, 2005 earnings conference.  Defendants again stated they had

"met with and presented both the restructuring plan and stock repurchase program with rating agencies," stating that the rating agencies had "no major concerns." Defendants also stated that the rating agencies "Recognize[d] MBNA's proven ability to increase earnings through a variety of economic and competitive cycles."

47.     On April 13, 2005, defendants issued a press release entitled "MBNA America Bank, N.A. Securitizes $750 Million of Credit Card Receivables from the MBNA Credit Card Master Note Trust." According to the press release, through the MBNA Credit Card Master Note Trust, MBNA would issue $750 million in credit card asset backed notes. "The Class A (2005-1) tranche consists of $750 million fixed rate asset backed notes. The three-year 4.20% Class A (2005-1) notes were priced at 99.97408% to yield 4.246%." According to the press release, the transaction, which was scheduled to close on April 20, 2005, was jointly-lead and managed by CSFB and JP Morgan and co-managed by Banc of America Securities LLC, Barclays Capital, Citigroup, Merrill Lynch & Co. and Morgan Stanley.

48.     On April 21, 2005, MBNA shocked the market, issuing a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the Previously Announced Restructuring Plan." The press release disclosed in relevant part that:

> [N]et income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004 *[and $0.59 per share in Q4 2004]*. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax *[double the $300-$350 million stated on January 21, 2005]*. Without the restructuring charge, net income was $514.1 million or $.40 per common share.

> In addition to the restructuring charge, the Corporation's results were further impacted by unexpectedly high payment volumes from U.S. credit card customers. The higher payments reduced managed loans in the quarter more than in prior years. Additionally, the payment volumes were particularly higher on accounts with higher interest rates, which adversely impacted the Corporation's yield on managed loans.

> As a result of these recent trends, in the revaluation of its interest-only strip receivable, the Corporation projected lower excess spreads and higher payments.

This reduced the interest-only strip receivable and resulted in a net loss from securitization activity of $206.6 million. The net loss from securitization activity is included in other operating income and caused the Corporation's first quarter 2005 other operating income to be lower than its first quarter 2004 other operating income.

The Corporation is implementing programs to offset the higher payment rates in the U.S. Card business. "It is a difficult environment right now. However, we've made progress on recent product introductions, diversification strategies, and improvements in credit quality and operating efficiency," said Bruce L. Hammonds, MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significantly below its 10% growth objective.

Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first quarter of 2004 [but a decrease from the $33.8 billion at December 31, 2004]. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0 billion compared to the first quarter of 2004 [down from $121.6 billion at December 31, 2004]. Total volume in the quarter rose to $49.3 billion, an increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3 billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0 billion, which decreased by 5% from the first quarter of 2004.

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and 4.48%, respectively *[up from 3.74% and 4.43% respectively in the Q4 2004]*. Delinquency on loan receivables and managed loans was 2.93% and 4.17%, respectively, at March 31, 2005 *[with delinquency on managed loans up from 4.13% in the Q4 2004]*. Based on improving asset quality trends, the provision for possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter of 2004.

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%. *In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.*

\*       \*       \*

As previously reported, MBNA Corporation has made significant progress on its plan to reduce its expense base. In connection with the restructuring plan, the Corporation will incur a charge of approximately $785 million pre-tax, $767.6 million pre-tax of which was recognized in the first quarter of 2005. The charge

includes three major components -- staff reductions related to voluntary early retirement and voluntary severance programs, the disposition of fixed assets relating to facilities closings, and contract terminations. Approximately 85% of the charge will result in cash expenditures.

Approximately $500 million of the charge is related to the voluntary early retirement program and voluntary severance program announced in January 2005. The Corporation expects staff reductions from the programs to result in pre-tax expense savings of approximately $210 million in 2005 and approximately $225 million in 2006. This charge is higher than previously announced because more people than anticipated decided to take advantage of the programs' benefits. The success of this initiative will assist the Corporation in reducing its staff, particularly in management positions, to levels that meet expected future business needs and make MBNA more efficient.

Approximately $115 million of the charge is related to the disposition of fixed assets resulting from the Corporation's previously announced review of its operations. After this review, management decided to consolidate operations and close some facilities. The Corporation expects the disposition of fixed assets to result in pre-tax expense savings of approximately $15 million in 2005 and approximately $25 million in 2006.

In addition, the Corporation terminated a marketing agreement with a third party vendor that marketed the Corporation's products to endorsing organizations and terminated a limited number of other agreements. Management determined that the marketing agreement did not adequately support the Corporation's long-term objectives. Approximately $170 million of the charge is related to these contract terminations. The Corporation expects the contract terminations to result in pre-tax expense savings of approximately $25 million in 2005 and approximately $50 million in 2006.

49.    The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company had been experiencing "unexpectedly high payment volumes from U.S. credit card customers" during the Q1 2005, reducing managed loans in the quarter "more than in prior years," and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1 2005 from $33.8 billion reported at the end of Q1 2004;

23

(b)     Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(c)     MBNA was suffering from a unseasonably sharp contraction in loans during Q1 2005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1 2004;

(d)     The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(e)     MBNA was experiencing higher-than-expected delinquencies during the Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f)     The Company had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

(g)     Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4 2004;

(h)     Approximately 50% of MBNA's receivables were on a variable floating rate while approximately 80% of the Company's funding is tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i)     Due to the increase in pre-pays, the interest-only securitization strips valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

(j)     The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

50.     Following the Company's shocking April 21, 2005 disclosures concerning the true state of its business operations, financial results and 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume.

51.     On April 28, 2005, the Company announced that its debt offering of medium term notes would be increased by over one-third – from $500 million to $750 million – significantly increasing the Company's borrowing costs.

52.     Also on April 28, 2005, Legg Mason issued an analyst report entitled "Consumer Finance – I/O Strip Issue Appears MBNA-Specific."  In its report, Legg Mason stated that "In our view, the weakness at MBNA is more fundamentally-related and company-specific.  With [Capital One] already reporting solid 1Q05 results (and no significant I/O strip writedown) and similarly-strong results expected for [Providian Financial Corp.], we doubt either is at risk."  Legg Mason also reported that "we believe [Capital One] and [Providian] have taken more conservative approaches to gain on sale recognition in the past, limiting the potential for writedowns on weaker-than-expected trends in the future."

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

53.     Plaintiff incorporates ¶¶1-52 by reference.

54.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of MBNA publicly traded securities during the Class Period.

56.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MBNA publicly traded securities.  Plaintiff and the Class would not have purchased MBNA publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

57.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of MBNA publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

58.     Plaintiff incorporates ¶¶1-57 by reference.

59.     The Individual Defendants acted as controlling persons of MBNA within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of MBNA, and their ownership of MBNA stock, the Individual Defendants had the power and authority to cause MBNA to engage in the wrongful conduct complained of herein.  MBNA controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and MBNA are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased MBNA publicly traded securities on the open market during the Class Period (the "Class").  Excluded from the Class are defendants.

61.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  MBNA had more than 1.277 billion shares of stock outstanding, owned by hundreds if not thousands of persons.

62.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

27

(e)    Whether the price of MBNA publicly traded securities was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

63.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

64.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

65.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to FRCP 23;

B.    Awarding plaintiff and the members of the Class damages, interest and costs;

C.    Awarding plaintiff reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 16, 2005

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO (CT-1838)
JEFFREY B. SILVERSTEIN (JS-4818)


_____
/S
CURTIS V. TRINKO (CT-1838)

16 West 46th Street, 7th Floor
New York, NY  10036
Telephone:  212/490-9550
212/986-0158 (fax)

LAW OFFICES OF ALFRED G.
   YATES, JR., P.C.

ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff

29

## CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

Scott Kimball ("Plaintiff") declares, as to the claims asserted, under the federal securities laws, that:

1.  Plaintiff has reviewed the class action complaint and authorizes its filing.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff's transactions in MBNA Corp. (KRB) that are the subject of this action are:

Purchased 2000 shares April 13, 2005 at $24.33

5.  During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in a case filed under the federal securities laws, except as follows (list, if any):

6.  The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _13_ day of May, 2005.

Scott Kimball